## **AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Carrie A. Jackson (Affiant), a Special Agent with the United States Department of Education (hereinafter ED), Office of Inspector General (hereinafter OIG), having been duly sworn, state as follows:

**A. Introduction**

1. I have been employed as a Special Agent by ED/OIG since August 2006, and have served as a Special Agent since February 2004. As part of my duties, I am authorized to conduct investigations in connection with the administration and enforcement of laws, regulations, orders, contracts and programs in which ED is or may be a party of interest, and perform other duties on behalf of the Secretary of Education. One of my duties as a Special Agent is to investigate suspected criminal activity involving ED programs such as federal student aid. As a Special Agent with ED/OIG, I have received criminal investigator training at the Federal Law Enforcement Training Center and the Inspector General Criminal Investigator Academy. As a Special Agent, I have participated in numerous criminal investigations and have participated in the execution of search warrants in furtherance of these investigations. I have training in the preparation, presentation, service and execution of criminal complaints, arrests, and search warrants. For the purpose of applying for this search warrant, I am a federal law enforcement officer under the applicable provisions of the United States Code and under Rule 41(a) of the Federal Rules of Criminal Procedure.

2. I am the case agent for an investigation involving violations of Title 20 U.S.C. § 1097, Student Aid Fraud, committed by Technical Learning Centers (hereinafter TLC). The facts set forth in this affidavit are based upon my personal knowledge, training and experience, knowledge obtained during my participation in this investigation, knowledge obtained from other law enforcement personnel, review of documents related to this investigation, statements of cooperating witnesses, and communications with others who have personal knowledge of events and circumstances described herein. This affidavit sets forth the facts necessary to establish probable cause and does not include all of the information collected to date.

3. Title 20 U.S.C. § 1097 applies to any person who knowingly and willfully embezzles, misapplies, steals, obtains by fraud, false statement, or forgery, or fails to refund any funds, assets, or property provided or insured under Title 20 Chapter 28 Subchapter IV (Student Assistance) and Title 42 Chapter 34 Subchapter I Part C (Federal Work Study Programs), or attempts to so embezzle, misapply, steal, obtain by fraud, false statement or forgery, or fail to refund any funds, assets, or property.

4. As set forth in detail herein, I believe that TLC and some its personnel made material false statements to ED in order to obtain federal funds under fraudulent circumstances.

5. This affidavit is made in support of an application for a search warrant to be executed by your affiant and ED/OIG agents for items at the following location:

**Location to be Searched:**  TLC, 1001 Connecticut Avenue N.W. Suite 435, Washington, D.C. 20036.  Based in part on verification made by an undercover ED/OIG Special Agent (hereinafter UCA) on July 23, 2008, and telephonic confirmation by your affiant on November 3, 2008, that this is the location of TLC.  This location is more particularly described in Attachment A and incorporated herein.

**Items to be Searched:**  Based on the following information, I believe there is probable cause to believe this location contains evidence, fruits, and instrumentalities of violations of federal criminal laws, including but not limited to, Title 20 U.S.C. § 1097.  Items are more particularly described in Attachment B and incorporated herein.

**B. Program Background**

6. Under the authority of Title 34 of the Code of Federal Regulations (hereinafter CFR), Part 600, ED is responsible for determining the eligibility of schools to participate in the Federal Student Aid programs (hereinafter FSA), as well as ensuring those eligible institutions properly execute their fiduciary responsibilities administering the programs. Once a school has received eligibility to participate in the FSA programs it must continually comply with the eligibility requirements set forth in 34 CFR Part 600.  In order for a private, for-profit educational institution to be eligible to participate in the FSA programs, it must meet the definition of a proprietary institution of higher education as set forth in 20 U.S.C. § 1002 (Higher Education Act) and 34 CFR § 600.5.  In general, if a participating school fails to meet these requirements, it must notify ED within 30 days as set forth in 34 CFR Part 600.40.

7. To participate in the FSA programs, a school must, among other things, be licensed by the State, accredited by an ED recognized accrediting agency, and enter into a Program Participation Agreement (hereinafter PPA) with ED.  By entering into the PPA, the participating school agrees to comply with the laws, regulations, and policies governing the FSA programs.

8.  TLC is a proprietary institution of higher education accredited by The Accrediting Council for Continuing Education and Training (hereinafter ACCET).  Masoud "Mark" Toufanian (hereinafter Toufanian) owns 100% of TLC.  ED approved TLC to participate in FSA programs on July 17, 2003, and again on March 30, 2005.  On each occasion, TLC entered into a PPA with ED.   Under its PPA, TLC was eligible to offer its Medical Assistant and PC Specialist programs.  In each PPA, TLC agreed to comply with the laws, regulations, and policies governing FSA programs.  As a result of the PPAs, TLC has been eligible to participate in the Federal Pell Grant Program (hereinafter Pell Grant), the Federal Family Educational Loan program (hereinafter FFEL), the Federal Direct Student Loan Program (hereinafter Direct Loan), the Federal Supplemental Educational Opportunity Grant, and the Federal Work-Study Program.

9. Although TLC had approval to participate in all of the listed programs, it relied primarily on Pell Grants and Direct Loans. The following is a brief description of Pell Grants and Direct Loans.

> The Federal Pell Grant Program, administered and funded by ED, provides financial aid to the neediest post-secondary students who qualify for assistance in meeting the high costs of attaining a post-secondary education. Pell Grants are outright grants that need not be repaid by the student recipients. The grants are advanced to the educational institution in which the student is enrolled. The school holds the funds as a fiduciary and may disburse the funds to the student directly or may credit the student's account to pay for institutional charges, such as tuition.
>
> The Federal Direct Loan Program, administered and funded by ED, provides financial aid to qualified post-secondary students who are enrolled at least halftime in eligible programs of study. Direct Loans, including Stafford /Ford loans (subsidized and unsubsidized), Parent Loan for Undergraduate Students (PLUS) and Consolidation loans, need to be repaid by the borrower.

10. A student applies for Pell Grants and Direct Loans by completing a Free Application for Federal Student Aid (hereinafter FAFSA), which is an ED application used to determine a student's eligibility for Federal Student Aid. Various pieces of information are collected on this application, such as the applicant's income, number of dependents, and assets. Students may complete the FAFSA themselves, or school employees may assist a student in completing the FAFSA. The completed FAFSA enables ED and the school to determine whether a student qualifies for Pell Grant and Direct Loan funds and, if so, the amount of funds to be awarded.

11. ED employs a formula to determine a student's Expected Family Contribution (hereinafter EFC). The EFC is the portion of the student's educational expenses that the student or the student's family will be responsible to subsidize. The EFC is determined by several factors, including the student's income and the number of dependents. Income is derived from the previous year's tax forms. Untaxed income is derived from Worksheets A and B of the FAFSA, while Worksheet C deducts excluded income. According to the FSA handbook, any child support payments made by a student whose income is reported on the FAFSA should be reported on Worksheet C. However, the student should not report child support paid for a child included in the household size reported on the FAFSA. The household size determines the standard living allowance that offsets family income in the EFC calculation. Household size includes a child when the parent provides more than half of their support. The FAFSA collects current (as of the day of signing the FAFSA) data about cash, savings, and checking accounts and investments, businesses, and investment farms. Allowances account for nondiscretionary expenses, such as taxes and basic living expenses. Once a minimum level of support has been provided for those expenses, the formula assumes that the remaining income is available for discretionary purposes, including paying for a postsecondary education.

The income protection allowance is based on household size and number in college. It takes into consideration food, housing, transportation, clothing and personal care, medical expenses, and family consumption. The available income and the contribution from assets are added together to obtain the adjusted available income. The total contribution from adjusted available income is calculated using a table that indicates the total amount the student's family is expected to contribute toward family postsecondary educational costs. The rate is based on the principle that as income increases beyond the amount needed to maintain a basic standard of living, the portion used for family maintenance decreases, while the portion available for discretionary purposes increases. The larger the income, the easier it is for family to contribute toward postsecondary educational costs with less effect on the maintenance of the family.

12. A financial aid administrator may use professional judgment on a case-by-case basis, only to alter the data elements used to calculate the EFC. The administrator can make professional judgment changes without a signature from the student. The reason for the adjustment must be documented in the student's file and the special circumstance shall be conditions that differentiate an individual student from a class of students rather than conditions that exist across a class of students. In making adjustments for unusual expenses, an aid administrator should keep in mind that income protection allowance is already included in the expected family contribution calculation to account for modest living expenses.

13. Once the amount of a student's Pell Grant and Direct Loan is determined, the school may request an advance of the funds from ED, which in recent years is typically done electronically (i.e., by computer transmission). After Pell Grant and Direct Loan funds have been disbursed, the school will be required to refund a portion of the funds to ED if during the academic year the student withdraws, or is expelled, from the school, as per 34 C.F.R. § 688.22. A school must promptly refund Pell Grant funds to ED for students who withdraw from school, and schools must promptly refund Direct Loan funds either to ED or to the student who withdraws from the school. A school must also have a formal leave of absence policy. If a student fails to return from a leave of absence, the withdrawal date would be the last date of attendance. According to the Federal Student Aid Handbook, up through the 60% point in each payment period or period of enrollment, a pro rata schedule is used to determine the amount of FSA funds the student has earned at the time of withdrawal. After the 60% point in the payment period or period of enrollment, a student has earned 100% of the federal student aid funds the student was scheduled to receive during the period. Failure to comply with ED refund policies is enforced by 20 U.S.C. § 1097, which provides criminal penalties of a fine of not more than $20,000 or imprisonment for not more than 5 years, or both. In order to account for any refunds owed to ED. ED regulations require schools to maintain a withdrawal policy to determine a student's last date of attendance.

### D. Description of Fraud Schemes

14. Based upon my training, experience, and participation in this and other investigations, your affiant has reason to believe that TLC has attempted and obtained Federal Student Aid by having TLC employees and by instructing students to make materially false statements on FAFSAs about the students' earned income, parent's income, child support, and the number of dependents. TLC made these materially false statements to maximize the amount of Pell Grant and Direct Loan funding for students who might otherwise be ineligible or eligible for less funding. TLC also changed students' attendance to reflect an attendance rate higher than 60% so that TLC could retain 100% of the students' scheduled federal student aid award. ED relied on these statements when it determined and scheduled the amounts of federal student aid funds to be released to TLC on behalf of the students.

### E. Evidence of Fraud Perpetrated

**Former TLC Employee Interviews**

15. In October of 2007, ED/OIG agents interviewed a former TLC employee (hereinafter FE1) regarding allegations of fraud. FE1 is presumed reliable based on the information provided being accurate and not misleading. FE1 alleged TLC's focus was to obtain money from ED. TLC targeted low income students by placing flyers at unemployment offices and in low income housing areas to attract students who qualified for maximum federal student aid. TLC accepted theses students despite knowing they did not have the ability to repay their federal loans. TLC advertised free computers to entice students to enroll and continue to attend. Upon enrollment, TLC assisted students with completing their FAFSAs and determined eligibility for federal student aid. According to FE1, TLC purposely misled students into believing they did not have to repay federal funds. FE1 told students they did not have to pay for school or mitigated repayment by stating it didn't have to be paid until they were finished. The employee stated students never paid out of pocket, because everyone was approved for Pell Grants and Direct Loans.

16. FE1 worked for TLC for three months. On eight or nine occasions during her employment, FE1 abused professional judgment when a student did not qualify for the maximum amount of federal student aid. FE1 deducted individual expenses from the student's income such as health care, day care, transportation, and assistance given to relatives despite these costs being accounted for in the EFC calculation. Toufanian instructed FE1 to utilize previous professional judgment worksheets as templates for new students who did not qualify for maximum aid. Toufanian inputted the changes in the financial aid system without the student's knowledge. When students forgot to bring their previous year's tax form, Toufanian instructed FE1 to have the student complete the FAFSA without the form. As part of their admissions process, TLC congratulated students on their admission after TLC determined the student was eligible for financial aid. Toufanian told FE1 that students were more likely to attend, if during their first visit they were congratulated and accepted.

Consequently, students always completed a FAFSA on their first visit. Employees would ask for the tax form later if the student was selected for verification, an ED process to randomly verify information provided by students.

17. According to FE1, every student had a file that included the enrollment/application paperwork, a form indicating the student received job placement, grade reports, attendance, and certificates. The files were kept alphabetically. Toufanian stressed file maintenance in case they were audited. There were no individual student financial accounts. FE1 explained that all of the federal student aid funds went into the TLC account, which was managed by Toufanian. Your affiant verified all draw downs on TLC's behalf were done by Toufanian through his logon mark@tlc-corp.com. TLC utilized an internal SQL database to track attendance and grades. The database was designed and maintained by Mehra Pirzadeh. Toufanian was also rarely at the school and had access to the database from home. All of the employees had their own logon names and passwords to the database. On October 6, 2008, your affiant verified through the internet service provider that a Digital Subscriber Line and a router were installed in TLC's server closet.

18. According to FE1, TLC stressed attendance during employee orientation, because it was how TLC obtained money from ED. According to the TLC student handbook and FE1, students had to have a 70% attendance rate to remain enrolled. TLC called students frequently who were not attending so that TLC could keep 100% of the federal student aid funds. However, if a student's attendance was less than 70% and completed the final exam, then they were awarded the certificate. FE1 stated that Toufanian changed the attendance in the database to reflect a 70% attendance rate. The employee described a situation when a student missed several months of class, but Toufanian called him and convinced him to complete the final exams in a two day period. The student passed the exams and was awarded his diploma. The student's attendance was falsified. Because the student's attendance was more than 60%, TLC could keep 100% of the students FSA funds.

19. On May 20, 2008, your affiant interviewed a former instructor (hereinafter FE2). FE2 is presumed reliable based on the information provided being accurate and not misleading. FE2 worked for TLC for one month in July of 2006, as an evening computer instructor. According to FE2, most of the students enrolled were just out of high school, had a GED, or maybe some college. The students had little to no computer skills. Normally, six to seven students attended regularly. The highest number of students she ever saw at one time was ten; however, twenty students were enrolled. Attendance was taken on a sign-in sheet and then entered into a computer. Toufanian was rarely at TLC, but monitored attendance closely. FE2 was required to notify him of students' failure to attend, so TLC could contact them. There was a big "push" by Toufanian and the students to get credit for being there and to take quizzes. According to FE2, most students were excited about the prospect of a free computer. She heard students say, "can't wait to get my computer." FE2 did not know if computers were ever given to students, but knew they were advertised. According to FE2, Toufanian wanted the

grading to be lenient.  FE2 described the program as very basic, starting with keyboarding and basic functions.  There were weekly tests, where students were required to obtain a score above 70%.

FE2 stated there were sixteen week long units and three additional units at three weeks apiece for a total of twenty-five weeks.  FE2 was uncertain about the cost of the program, but stated it should not have been more than $300-$500.  FE2 thought it might be free as part of a voucher program.  FE2 stated a certification program generally cost $800-$900, but this was not a certification program.  The class she taught was very basic and included exposure to Excel, Word, PowerPoint, and resume building.  When asked if a tuition of $10,000 was reasonable, FE2 stated, "Oh my god, no!"  She thought it was a lot of money for a basic program.  She stated the program wasn't a college education and for the same amount a student could get an associate degree at the University of District Columbia.  She said the program was very basic and might provide someone the skills to be an assistant somewhere, but not worthy of a certificate.

**Student Interviews**

20. On December 17, 2007, your affiant interviewed a former TLC student (hereinafter FS1).  F21 is presumed reliable based on the information provided being accurate and not misleading.  FS1 was almost seventy when he attended TLC in 2006.  FS1 attended regularly for approximately one month beginning in February.  FS1 had health problems, which prohibited him from completing the program.  FS1 did receive federal student aid.  FS1 completed the FAFSA on a TLC computer, and the TLC employees provided some assistance.  TLC promised students a computer if they achieved a 90% attendance rate.  FS1 never heard of anyone receiving a computer.  There was only one teacher for the entire program and it was self-paced.  FS1 never formally quit the program, but did not attend after February 2006.  TLC regularly called FS1 to continue to attend.  Eventually they stopped calling, but TLC called him again in the summer of 2007.  Your affiant verified TLC made its first disbursement of Pell Grants and Direct Loans on FS1's behalf in February 2006.  Despite his lack of attendance, TLC made the second of FS1's disbursements on June 12, 2006.  FS1 qualified for the maximum amount of Pell Grants and Direct Loans and TLC received these funds on FS1's behalf.  TLC offered FS1 a certificate.  FS1 told TLC he wouldn't accept it, because he did not finish a majority of the program.  An unknown TLC employee told FS1 he had attended long enough to earn a certificate.   FS1 did not learn he had to repay his financial aid until he received notice in the mail.  TLC told FS1 that federal student aid would pay for everything through grants.  FS1 did realize that he had to repay student loans, but he also thought the money was going to go to him, not directly to the school.    FS1 stated if he had been properly informed about the financial aid process, he would not have completed registration.

21. Your affiant reviewed TLC's ACCET accreditation file.  Located in the file was a September 6, 2007, "On Site Sampling Verification: Completion, Placement and Academic Data" conducted by ACCET.   TLC listed FS1 as a student.  According to the form, TLC falsely reported that FS1 completed the program, had a grade point average of 3.2, and a 72% attendance rate.

22. On January 2, 2008, ED/OIG agents interviewed a former TLC student (hereinafter FS2). FS2 is presumed reliable based on the information provided being accurate and not misleading. FS2 learned of TLC from a flyer she received on the street. TLC promised FS2 a computer upon completion and guaranteed her a job. FS2 started the program in February of 2006, but dropped out of the program after four months. FS2 explained that the enrollment process was very quick. She was assisted by a female employee. FS2 claimed Toufanian assisted her with completing documents. According to FS2, Toufanian frequently had students sign blank documents and then completed the forms himself. Toufanian completed FS2's FAFSA for her.

**ED/OIG Investigative Activity**

23. On April 28, 2008, an ED/OIG agent made a casual telephonic contact with a TLC representative by the name of Rebecca (last name later identified as Miller). When asked about tuition, Miller responded, "Don't worry about tuition, I've had several people come in saying they would never qualify for financial aid but ended up getting full grants. Our school is on a different tier level than other schools so our financial aid program is more flexible."

24. On July 9, 2008, an ED/OIG agent made an in-person casual contact with a TLC representative. The representative provided the agent a brochure on the Medical Assistant Program and a handwritten note, which showed that TLC's tuition was the same as the maximum amount of federal aid available to a student. The handwritten note was titled "<u>Financial Aid</u>" and indicated tuition was $12,221. The note delineated the maximum Pell Grant, Subsidized Direct Loan, and Unsubsidized Direct Loan amounts, which was $12,231.

25. On July 9, 2008, a UCA telephonically contacted TLC about enrollment. The UCA asked about tuition and the representative, Miller stated, "Well you would have to come in and apply for financial aid; in order to determine how much you are expected to pay." Miller explained most students received grants and loans, which they are not expected to pay while they are in school. Later in the conversation the UCA asked about qualifying for aid. Miller reiterated most students qualify for aid, but if they don't then they are contracted with "several government agencies that provide grants." Miller stated that more details could be given if the UCA made an appointment to visit TLC.

26. The UCA scheduled an appointment on July 14, 2008. The UCA was a male earning an income of $27,258. The UCA was divorced with three children living with his ex-wife in Texas. The UCA paid monthly child support payments of $700. The UCA had savings and investments totaling $12,500. Based on this information, the UCA was not eligible for maximum Pell Grant or Direct Loan amounts. The UCA met with Miller, who described the program as self-paced. The UCA asked how much the program was and expressed concerns about assistance. Miller described three types of assistance: grant, subsidized loans, and unsubsidized loans.

Contrary to their earlier conversation, Miller stated, "The only other options, I can really present to you are to go through the Department of Employment Services, but generally, for you to get their services, you have to be unemployed… and that process takes about 3 months also." Miller did not tell the UCA the cost of attendance.

27. Subsequently, the UCA agreed to complete a FAFSA. Caniece Childs, a TLC employee and former student, assisted the UCA with completing the application on a computer in the reception area. In response to question 51 on the FAFSA, "Do you have children who receive more than half of their support from you," the UCA asked Childs if it mattered that he was paying child support. Childs told the UCA to respond yes to question. The UCA asked again if it mattered that he was paying child support, and she responded that he still needed to respond yes. Later in the application process, the UCA had questions about the number of family members in his household. Childs asked how many kids the UCA had, to which he responded that he was divorced with three kids living in Texas. Childs stated, "See, because you put…" The UCA interjected, asking if he needed to change what he reported earlier in Question 51. Childs explained the system would not accept an input of one based on his earlier answer of having children he supported. Subsequently, Childs instructed the UCA to falsely state his household size was four. Childs asked, "And did you claim them on your taxes?" The UCA responded no. Childs did not respond to the UCA's answer or instruct him to correct the information on his FAFSA. TLC never asked for or reviewed the UCA's 2007 Tax Form. Even though the UCA was including the children in his household size, Childs assisted the UCA in calculating the yearly child support amount to report on his Worksheet C. As a result, the UCA reduced his available income and increased his standard living allowance. Childs continued to assist the UCA on the FAFSA telling the UCA to falsely enter "0" for the balance of his bank account. The UCA mumbled the question to himself, and Childs interrupted him stating he could put a little amount down if he wanted. The UCA asked if he needed to report his bank account balance, and Childs falsely stated, "No. It's up to you, it's your discretion." They continued with the FAFSA, and Childs told the UCA to falsely state his net worth by stating, "You want to put 0 for that one too. That's your net worth…..we're not worth a penny." Based on the false information reported on the FAFSA, the UCA was eligible for maximum Pell Grant and Subsidized Direct Loan amounts he would not have otherwise been eligible to receive.

28. TLC's student enrollment agreement indicated the UCA's tuition source was federal financial aid and the method of payment was financial aid. The maximum amount of federal student aid that can be received is $4,731 in Pell Grants, $3,500 in Subsidized Loans, and $4,000 in Unsubsidized Loans. According to the U.S. Department of Education's Common Origination and Disbursement (COD) system, the UCA was awarded $4,731 in Pell Grant funds, $3,500 in Subsidized Direct Loans, and $3,600 in Unsubsidized Direct Loans for a total of $11,831. TLC's PC Specialist program was advertised at $11,831. TLC never had the UCA sign the Master Promissory Note (MPN) required to disburse aid. The UCA stopped attending after eight day days, and TLC never drew down funds on the UCA's behalf.

29. While attending TLC, the UCA observed a total of six employees.  The attendance of students varied and was less than half of the students listed on the attendance form.  The attendance for the two programs varied between five and ten students.   Your affiant reviewed the National Student Loan Database System and COD to confirm that thirty six students were receiving Fiscal Year 2009 (beginning July 1, 2008) Pell Grants.  The UCA observed student files located in Miller's office and noticed Toufanian's door was always closed.

30. The PC Specialist program was described as a nine month program with the potential to finish in seven months.  According to TLC's ED Eligibility and Certification Approval Report (ECAR), the PC Specialist Program was 24 semester credit hours, 720 clock hours, and 36 weeks long.  The program required students attend Monday through Friday for four hours a day to complete the program in nine months.  The UCA was enrolled in the 6:00 p.m. to 10:00 p.m. session, but was released at 9:00 p.m. each night.  During a conversation with other students, the UCA asked about financial aid.  One student indicated his employer was paying for the program, while another female student stated she didn't know how she or who was paying for her tuition.

**F.  Evidence Sought**

31.  Based on the foregoing, I submit there is probable cause to believe that the following items, which would constitute evidence of criminal activity will be maintained in the TLC facility located at <u>1001 Connecticut Ave NW Suite 435, Washington D.C.</u> (and further described in Attachment A): student academic records, student attendance records, TLC financial/business records, TLC employee records, and TLC computer records/data.  Such records which relate to TLC, its students and employees, and which I have probable cause to believe are maintained in the premises to be searched, are more specifically set forth at Attachment B hereto (Items to be Seized), which is incorporated herein.  Based on my experience and knowledge of this investigation, I know it is typical for these types of records to be maintained by an educational institution such as TLC, and that these types of records are customarily kept in the form of hard-copy documents and computer records.  Further, ED regulations require educational institutions such as TLC to retain student financial aid records for a period of three years.

32.  Based upon my training, experience, and information related to me by computer forensic experts, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

> Searching TLC's computer system for the evidence described in Attachment B will require a range of computer forensic analysis techniques.  Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information.

In order to properly execute the search authorized by the warrant, specially trained agents or forensic analysts will be required to conduct a thorough forensic analysis of the seized media, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever computer forensic analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

Your affiant recognizes that TLC is a functioning company, and that a seizure and removal of TLC's computer network may have the unintended and undesired effect of limiting the company's ability to provide service to its legitimate customers who are not engaged in Student Aid Fraud. In response to these concerns, the agents who execute the search will take an incremental approach to minimize the inconvenience to TLC's legitimate customers and to minimize the need to seize equipment and data. This incremental approach, which will be explained to all of the agents on the search team before the search is executed, will proceed as follows:

 A. The computer forensic examiner will attempt to create an electronic "image" of all computers that are likely to contain TLC records and information. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer forensic examiner or another technical expert will then conduct an off-site search for TLC records and information from the image copy at a later date.

 B. If "imaging" proves impractical, or even impossible for technical reasons, then the agents will seize those components of the TLC computer system that the computer forensic examiner believes must be seized to permit the agents to locate TLC records and information at an off-site location. The components will be seized and taken into the custody of the agent. If employees of TLC so request, the computer forensic examiner will, to the extent practicable, attempt to provide the employees with copies of any files not within the scope of the warrant that may be necessary or important to the continuing function of the TLC's legitimate business. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

33. Based upon the foregoing information, there is probable cause to believe that TLC made and instructed students to make materially false statements, which ED relied upon in determining eligibility for property provided and insured under Title 20 Chapter 28 Subchapter IV, Student Assistance. TLC also altered attendance records to ensure it received 100% of students' federal student aid. I believe that a search of TLC, 1001 Connecticut Ave. N.W. Suite 435, Washington D.C. will yield evidence to support the investigation of possible violations of federal criminal laws, including, but not limited to, Title 20 U.S.C. 1097 (Student Aid Fraud) and Title 18 U.S.C. 1001 (False Statements). I hereby swear that the above information and facts are true and correct to the best of my knowledge.

_____
Carrie A. Jackson
Special Agent, U.S. Department of Education
Office of Inspector General

Sworn and subscribed before me
This \_\_\_ day of November 2008

_____

United States Magistrate Judge